## No. 8539.

### NORTH POUDRE IRRIGATION COMPANY *v.* LIGGETT.

1. CONTRACTS—*Construed.* A corporation organized to construct an irrigating canal and reservoirs, executed a contract by which it agreed to sell to a party named, a water right, entitling him to 1.3 cu. ft. of water per second of time, for the irrigation of particular lands described. That corporation and one which succeeded it, failed, and the property passed to defendant. The contract for the water right, and the land and the water to be furnished under the contract, became vested in plaintiff.

Defendant purchased other rights than those to which the original corporation was entitled and constructed reservoirs not contemplated in the original plan, expending in this manner a very large sum of money. *Held* that the contract was a binding servitude upon the canal, and the reservoirs constructed prior to defendant's acquisition of the property, the canal and such reservoirs to be taken and considered as a system for supplying water under the contract; and that plaintiff was limited to this source of supply.

The contract also provided that when a number of water rights equal to the estimated capacity of the canal should have been sold, it would issue to the holder of each right, shares of its stock bearing to the total stock the same proportion as the water right sold under the contract should bear to the number of water rights equal to the capacity of the canal, and that the purchaser of the water right named in the contract should accept the same; and that in case the volume flowing in the canal should be insufficient to supply all holders of water rights outstanding, the company might distribute the water among the holders of rights *pro rata.*

The agreed capacity of the canal was 216 water rights of 1.3 cubic feet per second of time. Prior to defendant's acquisition of the property only thirty rights had been sold. The purchasers of all these, except plaintiff, had accepted stock

in the defendant, each in an amount sufficient to irrigate eighty acres of land. Plaintiff refusing to accept stock, *held* that in time of scarcity he was required to pro rate with the other holders of all the 216 water rights.

*Error to Larimer District Court, Hon. Neil F. Graham, Judge.*

Mr. R. W. FLEMMING, for plaintiff in error.

Mr. FRANK J. ANNIS and Mr. JOHN P. KILGORE, for defendant in error.

Mr. Justice Garrigues delivered the opinion of the court.

THIS action involves the construction of a water contract. Plaintiff Liggett commenced the suit against the defendant company to enforce the delivery of water for irrigation, under the contract. He obtained a decree in the lower court, and defendant brings the case here as plaintiff in error.

The North Poudre Land, Canal & Reservoir Company, organized in 1880 to construct an irrigation system composed of a canal and series of reservoirs, taking water from the North Fork of the Cache la Poudre river, did considerable construction work, and in the general adjudication of 1884, the system was given a conditional decree. (See *W. S. & S. Co. v. Tenney*, 24 Colo. 347, 51 Pac. 505.) This company failed to complete the undertaking and in 1888, the North Poudre Land & Canal Company was organized, took over and attempted to complete the project. In 1890, it entered into the contract involved in this action, with one Morse, which, so far as pertinent to the inquiry, is as follows:

"No. 15."

"AGREEMENT FOR ONE WATER RIGHT."

"This agreement, made this first day of January, in the year 1890 between The North Poudre Land & Canal Company a corporation existing under the laws of Colorado,

party of the first part, and E. F. Morse, of the county of Larimer and State of Colorado, party of the second part,

WITNESSETH: That in consideration of the stipulations herein contained, and the payments to be made as hereinafter specified the first party hereby agrees to sell unto the second party one water right to the use of water flowing through the canal of said party of the first part, each water right representing one and three-tenths cubic feet of water flowing over a weir per second, subject to the following terms and conditions, to which the said party of the second part or assigns expressly agree:

1. That said first party agrees to furnish the said water to the said second party or assigns continuously during the irrigation season, except as hereinafter provided, and at no other time.

2. Said water shall be used only for domestic purposes, and to irrigate the following described tract of lands, and none other, to-wit: S½ of NE¼, 9-8-68 W. 6th P. M., and under no circumstances shall said water, or any part thereof be used for mining, milling or mechanical power, or for any other purpose not directly connected with or incidental to the purposes first herein mentioned.

3. The said second party or assigns shall not permit said water or any portion thereof, furnished as aforesaid, to run to waste; but as soon as a sufficient quantity shall have been used for the purposes herein allowed and contracted for, the said second party or assigns shall shut off said water and keep the same shut and turned off until the said shall be again needed for the purposes aforesaid; but in no case shall the amount of said water taken or received by said second party or assigns exceed the quantity hereby sold.

4. The said first party shall deliver said water at such point or points along the line of said ditch or from any of its reservoirs, either or all, as it may determine to be the most practicable, and the manner of withdrawing and regulating the supply of said water from said first party's ditch and reservoirs shall be prescribed by said first party,

and shall at all times be under its control, as determined and directed by the Board of Trustees of said first party. The headgates, flumes, weirs or other arrangements through which the water hereby sold shall be drawn off from the said first party's ditch or reservoirs, shall be made and placed in position by said first party, but at the cost of the said second party, who shall also be liable for the expense of keeping the same in good repair and condition, and the said first party may collect and enforce the payment of all sums expended for said purposes in' the same manner as prescribed for collecting and enforcing assessments.

5. The said first party agrees to keep and maintain said canal and any and all of its reservoirs in good order and condition, and in case of accident to the same to repair the injury thereby occasioned as soon as practicable and expedient; and the first party shall have a right to assess for ordinary expenses of maintaining, repairing and superintending said canal and any and all reservoirs connected therewith, a sum not exceeding twenty-five dollars per water right sold, per annum, and in addition thereto may when necessary, by reason of some unforeseen or unavoidable accident, assess all owners or holders of water rights *pro rata* such sum as may be necessary to repair the injuries so occasioned. The amount, manner of collection and time of payment of all assessments herein provided for shall be determined by said first party according to its judgment and discretion; and the first party also reserves to itself the right to establish and enforce such rules and regulations, and to provide and declare such penalties as it may deem necessary or expedient for the purpose of enforcing and collecting said assessment or any part thereof.

6. The said party of the first part agrees that when it shall have sold and shall have outstanding and in force, such number of water rights as shall in the opinion of the corporation equal to the estimated capacity of its canal to furnish water, and all of the purchasers of such water

rights shall have fully complied with and performed the terms and conditions of their respective contracts, or before that time, if said party of the first part shall so elect, it will, without further consideration issue and deliver to the owner and holder of each water right hereby sold, that number of shares of its capital stock or as near thereto as can be computed without making fractions of shares, which shall bear the same proportion to seven thousand five hundred that the number of water rights hereby sold bears to the number of water rights which may be ascertained to be equal to the said canal's capacity to furnish water as aforesaid, which the said party of the second part agrees to accept. But said distribution of stock shall include no interest in any lands which may at any time be owned by the company, but the same may be sold or held for the benefit of those who are stockholders of record before the distribution of stock to water contractors in this article specified; and stockholders who may acquire stock under the provisions of the article, and by reason of this contract, shall not thereby acquire any interest in said lands, but said corporation may before making such distribution of stock to holders of water contracts, convey all the lands of said company not then sold or contracted to be sold, to the stockholders of record before such distribution, or to trustees or a trustee for their ratable benefit.

7. It is hereby distinctly understood and agreed by and between the parties hereto, that in case the canal of said party shall be unable to carry and distribute a volume of water equal to its estimated capacity, either from casual or unforeseen or unavoidable accident, or if the volume of water prove insufficient from drouth, or from any other cause beyond the control of said first party, the first party shall not be liable in any way for the shortness or inefficiency of supply occasioned by any of said causes.

8. It is further agreed that if by reason of any causes the supply of water shall be insufficient to fill and flow through said canal according to its estimated capacity, or if from any other cause, as aforesaid, beyond the control

of said first party, the supply shall be insufficient to furnish an amount equal to all the water rights then outstanding, the said first party shall have the right to distribute such water as may flow through said canal to the holders of such water rights *pro rata;* and, for the purpose of so doing, may establish and enforce such rules and regulations as it may deem necessary or expedient.

9.   *   *   *

10.   *   *   *   It is also stipulated and agreed that from and after the execution hereof, the said second party may enter into the use and enjoyment of the water flowing through said ditch to the extent of the right above contracted to be conveyed as fully as though a final certificate for said right had been issued; but subject, nevertheless, to all the terms and conditions above set forth.

It is further expressed, understood and agreed between the parties hereto, that neither this contract nor any of its terms, conditions or provisions shall be in any manner supplemented, altered or changed from what has been provided, or any other or further contract be made respecting the subject matter of this contract except that it be endorsed hereon in writing, signed by the president, and attested by the secretary, under the corporate seal of said first party."

In 1903, Liggett became the owner of the contract and the land to which it applied. This company failed, and was succeded in 1896 by the National Land & Irrigation Company, which also failed, and in 1901 plaintiff in error, The North Poudre Irrigation Company, became the owner. It is a mutual company in which the stock stands for and represents the consumer's interest in the water, canal and reservoirs. Before defendant acquired the property, only 30 water contracts had been issued, each representing 1.3 cubic feet per second, and instead of selling the remainder of the 216 rights, which it is agreed would exhaust the capacity of the ditch, this company called in the contracts, issuing in lieu of each right stock of the corporation representing a sufficient amount of water for the irrigation of

eighty acres. Plaintiff, however, declined to surrender his contract, or to accept stock therefor. The company purchased independent priority water, and had it transferred by decree from other ditches to its headgate; it also constructed new and other large reservoirs, not contemplated or included in the original plan of furnishing contract holders with water, expending in such behalf some $850,000.00 above the expense incident to the management, up-keep and maintenance of the property. All this was done after defendant acquired the property.

The judgment of the lower court requires the irrigation company to furnish and deliver to plaintiff, his heirs and assigns, on the contract, one eighty-acre water right to the use of water flowing through the canal representing 1.3 cubic feet per second during the irrigating season when sufficient water is available from the canal and reservoirs of the company, from any water flowing in the canal or stored in the reservoirs, out of all ditch and reservoir priorities and appropriations belonging to defendant, excepting, however, all reservoirs constructed, and all independent water rights acquired by defendant since it became the owner of the property the delivery to be made on the basis of 1/30 of such water, instead of 1/216, to each eighty-acre water right in times of scarcity. The decree failed to place plaintiff upon a pro-rating basis with the remaining water rights represented by stock.

Garrigues, J., after stating the facts as above:

1. It is admitted in the briefs that the canal had a capacity of 216 eighty-acre water rights and the contract provides when this capacity is sold the property shall be turned over to the water right holders who shall stand upon an equal footing and in times of scarcity pro-rate on this basis. The plan as originally contemplated failed, and only 30 of the 216 rights were sold on such contracts. When defendant acquired the property in 1901, it was contemplated and intended that all the water rights would be represented by stock. No more contracts were issued and

29 of the 30 were voluntarily surrendered upon a stock basis.

Plaintiff's contract, when defendant acquired the property, was an easement in the canal and reservoirs and a binding servitude upon the property. The question is, to what extent is the property of the company now charged with this servitude, or in other words, from what source may plaintiff insist that his water right shall be supplied? Defendant contends that the servitude is restricted exclusively to the canal, and water for direct irrigation from it, and does not include or rest upon any of the reservoirs or reservoir water, and that it is under no obligation to supply plaintiff with any reservoir water. The court held that the servitude created by the easement, extended to and rested upon the canal, and all reservoirs built prior to defendant's acquisition of the property, taken together as a whole and constituting a system for supplying water under the contract. In this respect the decree is correct. The ditch has a very late priority, and depending on the river water alone, one would only obtain a few days' run, which would be during high water. The plan as a whole for supplying its consumers with water, contemplated reservoirs as a part of the system which were to be built, owned and controlled by the canal company, and used in connection with the canal as a means of furnishing water on the contracts. We therefore are of the opinion that the supply from which plaintiff was entitled to have the water furnished him under his contract, was the canal in connection with such reservoirs. After the project passed into the hands of the mutual company, plaintiff in error, it built other reservoirs and acquired independent water from other sources not contemplated in, and foreign to the contract, for the exclusive use of its stockholders, in which plaintiff had no interest. Plaintiff stood upon his contract and refused to become a stockholder, and his rights are governed by his contract, and he is limited to the source of supply therein contemplated.

2. There is another branch of the case, however, in

which the decree is wrong. The court appears to have acted upon the theory that as no contracts were issued for the remainder of the 216 water rights, therefore the 30 contracts sold represented preferred water to the exclusion of the remaining water rights represented by stock, and in times of scarcity, plaintiff was obliged to pro-rate with only 30 rights. In this, the court was in error. The recognized capacity of the canal was 216 water rights of 1.3 cubic feet, and the agreement was, that all should stand upon an equal footing and pro-rate in times of scarcity. Because the original plan was not carried out and but 30 of these rights had been sold when the system was changed or converted into a mutual ditch company wherein the balance of the shares were represented by stock, does not change or enlarge plaintiff's original interest in the system. He purchased a 1/216 interest which the court has enlarged by decree into a 1/30. Because contracts were not issued for the remaining rights, which are now represented by ditch stock, does not change plaintiff's status with the other consumers. He must still pro-rate upon the same basis as if the remaining water rights had all been sold under contract like his own.

The cause will be reversed and remanded with directions to the lower court to modify the decree in accordance with the views herein expressed, and the costs in this court are taxed to plaintiff in error.

Reversed and remanded with directions.

Decision *en banc.*